**Peggy POE, Plaintiff–Appellee,**

v.

**John LEONARD, Defendant–Third–Party–Plaintiff–Appellant,**

**Douglas Pearl, Defendant,**

**State of Connecticut, Third–Party–Defendant.**

**Docket No. 00–9024.**

United States Court of Appeals, Second Circuit.

Argued June 5, 2001.

Decided Feb. 19, 2002.

Terrence M. O'Neill, Assistant Attorney General, Hartford, CT, on behalf of Richard Blumenthal, Attorney General for the State of Connecticut; Lynn D. Wittenbrink and Gregory T. D'Auria, Assistant Attorneys General, on the brief, for Defendant–Appellant.

Kathryn Emmett, Emmett & Glander, Stamford, CT; Christine Caulfield, on the brief, for Plaintiff–Appellee.

Before: CABRANES, STRAUB, and SACK, Circuit Judges.

STRAUB, Circuit Judge.

Defendant–Appellant John Leonard appeals from an order of the United States District Court for the District of Connecticut (Alan H. Nevas, *Judge*) denying his motion for summary judgment, which asserted a defense of qualified immunity, and denying his motion *in limine* to exclude Plaintiff Appellee Peggy Poe's expert witness.

This appeal arises out of alleged misconduct by Douglas Pearl, then a trooper with the Connecticut State Police ("CSP"), who surreptitiously videotaped Poe undressing at the CSP Training Center after asking Poe to appear in a training video. Poe sued Pearl and Captain John Leonard, Pearl's former supervisor, in their individual capacities under 42 U.S.C. § 1983, alleging that, while acting under color of state law, Pearl violated her constitutional right to privacy and Leonard violated her rights by his gross negligence or deliberate indifference in failing to adequately train, supervise, and discipline Pearl.

Both defendants moved for judgment on the pleadings, and the District Court granted the motion on the state law claims of negligence but denied the motion in all other respects. The District Court ruled that Poe had stated a claim for the violation of her constitutional right to privacy under the Fourteenth Amendment in her unclothed body and that this right was clearly established before the incident occurred. *See Poe v. Pearl*, No. 94 Civ. 2058(AHN), 1997 WL 76576, at *6 (D.Conn. Jan.29, 1997).

Approximately two and one-half years later, Leonard moved for summary judgment on the basis of qualified immunity. Leonard also moved *in limine* to preclude the testimony of Poe's expert witness, Dr. Louis A. Mayo. The District Court denied both motions. In its ruling, the District Court clarified that the scope of Poe's claim against Leonard was Leonard's alleged gross negligence in his managing, supervising, training, and disciplining of Pearl. The District Court concluded that genuine disputes of material fact existed as

to whether Leonard was grossly negligent and that these disputes precluded finding that, as a matter of law, Leonard's conduct was objectively reasonable.

This appeal again forces this Court to address the often complex subject of qualified immunity, particularly as it relates to the existence of appellate jurisdiction, to a supervisor's responsibility over a subordinate who commits an intentional constitutional tort, and to a plaintiff's constitutional right of privacy in a non-seizure, non-prisoner context. We hold that in order for a supervisor to be held liable under section 1983, both the law allegedly violated by the subordinate and the supervisory liability doctrine under which the plaintiff seeks to hold the supervisor liable must be clearly established. By 1993, it was clearly established that a police officer violates a person's Fourteenth Amendment right to bodily privacy when that officer views, photographs or otherwise records another's unclothed or partially unclothed body, without that person's consent. By 1993, it was also clearly established that a supervisor could be liable if he had actual or constructive notice that it was highly likely that his subordinate, while on duty, might violate another's right to privacy in his or her unclothed body, but the supervisor deliberately or recklessly disregarded that risk by failing to take reasonable action to prevent such a violation, and that failure caused the constitutional injury to the plaintiff.

Construing all the facts and drawing all reasonable inferences in Poe's favor, we conclude that Leonard is entitled to qualified immunity because the evidence that Poe asserts should have put Leonard on notice that he needed to supervise Pearl more closely is insufficient as a matter of

law to demonstrate that Leonard is liable as Pearl's supervisor under clearly established law. Put another way, Poe fails to adduce enough evidence to establish that Leonard's inaction was reckless or deliberately indifferent to a high risk that Pearl would violate Poe's constitutional rights. Moreover, we conclude that reasonable supervisors in Leonard's position, knowing what he knew, could disagree as to whether his inaction was unlawful. Therefore, we reverse the order of the District Court denying Leonard's motion for summary judgment and remand to the District Court with instructions to dismiss with prejudice the complaint against Leonard.

## BACKGROUND

Because this is an appeal from the denial of a motion for summary judgment, we construe the evidence in the light most favorable to Poe, the non-moving party. *See, e.g., Goldberg v. Cablevision Sys. Corp.,* 261 F.3d 318, 324 (2d Cir.2001).

### I. Factual Background

### A. *The Filming of the Trooper Candidate Testing Videos*

At some time during the fall of 1992, several administrative officials of the Connecticut State Police ("CSP") and the Connecticut Department of Administrative Services began to revise the testing procedures for trooper candidates at the CSP Training Academy ("police academy"). Captain Leonard, who had just assumed command of the CSP Bureau of Selections and Training,[1] supervised this ongoing project along with Dr. Martin Anderson ("Dr. Anderson"), the Chief Personnel Psychologist for the State of Connecticut. A particular focus of this project was the devel-

---

1. Captain Leonard was the commanding officer of the police academy, the unit responsible for selecting new troopers, and the CSP polygraph unit. The project to revise the testing procedures began under Leonard's predecessor, Major John Rearick.

opment of several testing videos, designed to screen out those trooper candidates with poor observational and communicative skills. In essence, trooper candidates would be required to view a videotaped scene of a crime or other representative "real life" scenario that CSP officers typically confront and then to explain what they had observed. As originally planned, the video scenes would include a variety of circumstances: a depiction of a person driving while intoxicated, a man with a weapon who stops and robs a victim, a simple trespass, a "static" crime scene, and a scene with a distraught victim.

During this project, Leonard met with Dr. Anderson and with Pearl, who was the trooper responsible for the production of training and public service videos. Although Pearl had several supervisors at the police academy, Leonard directly supervised Pearl in connection with the testing videotape production.

Pearl, unfortunately, had a history of inappropriate or otherwise problematic behavior with female civilians while on duty. Pearl's personnel file contains four separate improper incidents in a seven-year period, two of which bear mentioning for our purposes. In 1989, Pearl was given an unsatisfactory performance evaluation report for photographing several young women in swimsuits in a private bedroom while filming a public safety announcement. In 1983, a woman filed a formal complaint against Pearl, alleging that he made "numerous unwanted and improper advances" toward her and improperly touched her when he escorted her to and from the hospital following her epileptic seizure. These incidents, however, all occurred well before Leonard assumed command.

Although the incidents were described in Pearl's personnel file, at no time prior to the incident involving Poe did Leonard review Pearl's personnel file.[2] Leonard was unaware of, and was not informed by his predecessor[3] of, any performance or disciplinary issues involving Pearl at any time prior to the incident involving Poe.[4] In his affidavit, Leonard indicated that it "is not the policy or practice of the CSP for supervisors newly assigned to supervi-

2. The CSP maintains two separate personnel files on each officer, a working file maintained at the officer's work unit, containing annual performance appraisals and administrative documents such as requests for leave, and a separate detailed official file kept at CSP headquarters. Although Leonard conceded that Pearl's unsatisfactory performance evaluation concerning the 1989 incident is of a type that would ordinarily be available to him as a supervisor, the record does not reveal whether this evaluation and the other reports documenting Pearl's past misconduct were in Pearl's working file.

3. It is unclear from the record whether Leonard's predecessor knew of Pearl's history. Leonard's response to Poe's first set of interrogatories indicates that Major Rearick was Pearl's supervisor from June 11, 1990 until October 3, 1992, a period that began after the date of the last problematic incident noted in Pearl's personnel file.

4. In her statement of disputed material facts, Poe does not dispute these last two facts, but states that "Leonard should have been aware of Pearl's history of performance and/or disciplinary problems prior to the underlying incident." Pl.'s Statement of Disputed Material Facts ¶ 5. However, Poe fails to cite any factual support for this allegation, which is essentially a legal conclusion. In responding to a motion for summary judgment, once the movant has established the absence of a disputed material issue, the nonmovant "may not rest upon [ ] mere allegations or denials" but "must set forth specific facts showing that there is a genuine issue for trial." FED. R.CIV.P. 56(e); see Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000). Thus, we will address whether Leonard "should have been aware" of Pearl's history as a legal matter in light of the facts Leonard knew.

sory positions to review the personnel, disciplinary or internal affairs files of subordinate employees without some justifiable reason to do so." Leonard Aff. ¶ 11. Leonard also testified during his deposition that while outgoing supervisors and their replacements may discuss informally any pending personnel problems, the CSP had no formal policy of outgoing supervisors providing such information to their replacements.

Unaware of Pearl's history, Leonard gave him "blanket permission" to make any arrangement that Pearl saw fit for filming the scenes. Although Leonard did not supervise any of the actual filming by Pearl, he viewed the draft videos Pearl produced. Of particular relevance to this appeal and as pressed by Poe is the static crime scene video, produced before the incident involving Poe. This crime scene features a motel room in disarray, with beer bottles and articles of clothing strewn about, and a gun on the bed. As Pearl, the cameraperson, films the inside of the bathroom, he eventually focuses on bloodstains on the wall and the body of a gagged, female victim in the bathtub with her clothes in disarray.

Poe emphasizes two portions of the video: a focus on a bra on the bed and a lingering shot on the victim's upper thigh region. The entire crime scene lasts for approximately one minute and forty-five seconds on the testing video. During that time, Pearl pans the camera to the bra on the bed for approximately one-half of one second, and later returns to focus on the bra for approximately two seconds. Pearl also focuses on other articles of clothing in the room. For example, he focuses on a

pair of men's black socks on the floor for one second. In between the shots of the bra, Pearl films the disorder by the dresser for approximately fifteen seconds. Pearl then moves into the bathroom, where he focuses on the bathroom sink, located opposite from the tub, for approximately eight seconds. Pearl then spends a total of thirty-four seconds filming the female "victim" who is lying in the tub, with one leg extending outside of the tub. The victim is wearing a cropped, short-sleeve T-shirt and what appears to be a white pair of shorts that is hiked to her upper thighs. Pearl lingers for approximately seventeen seconds on the victim's lower body, with a close-up on her upper thighs. He then pans out to include her legs and pans up to show her clothed upper body with a final focus on her head for another six seconds.

After viewing the static crime scene video, Leonard did not express any concern nor question Pearl about the scene. Although he knew that the woman playing the victim was a motel employee, and not a CSP officer, Leonard did not discuss any specific procedure that Pearl should follow when filming a video with civilian participants.[5]

Upon his completion of the static crime scene video, Pearl's next task was to film a scenario involving an armed robber robbing a convenience store. Although the scene originally contemplated a male robber, Pearl suggested to Leonard during their meeting that the role be recast as a woman in order to make the scene "atypical." Pearl told Leonard that a friend (Poe) of Pearl's fiancée would play the

---

5. Poe also argues that upon viewing the static crime scene video, it "should have been obvious" to Leonard that Pearl and the "victim" were alone during the video shoot. There is nothing, however, in the crime scene video to suggest the presence or absence of others besides Pearl and the motel employee. Assumptions are not facts and "unsupported allegations do not create a material issue of fact" for summary judgment purposes. *Weinstock*, 224 F.3d at 41.

robber. Pearl testified in his deposition that, during this meeting, he remembered "discussing the fact that we wanted the female robber to display 'a lot of cleavage,'" in order to distract the testing candidates from the threat at hand. Leonard did not object to or question Pearl about this last suggestion.

Pearl invited Poe to the police academy, suggesting that she dress "provocatively" so that her appearance would be distracting to the testing candidates and that she bring several changes of clothing in case the clothing she wore was not appropriate for the look he wanted to achieve. After Poe arrived at the police academy wearing a skimpy low-cut blouse, Pearl directed her to change her clothing, specifically requesting that she "lose the bra." Pearl suggested that she change clothes in his office, told her where to stand, and left the room. Once Poe removed her shirt and bra, she noticed that a video camera sitting on a shelf was videotaping her. Poe brought the tape to the CSP, which investigated the incident and terminated Pearl.

### B. *Relevant Policies and Procedures of the CSP*

Poe argues that Leonard's failure to supervise Pearl more closely, after viewing the static crime scene video, violated Leonard's duties as defined by CSP regulations. Two of the guidelines of the Connecticut Department of Public Safety Administration & Operations Manual applicable to Captain Leonard as a commanding officer read as follows:

2.4.3b.(4) Command personnel shall delegate authority and shall supervise the work of subordinates closely, holding frequent conferences to guide and direct activities.

. . . . .

2.4.3b.(10) Command personnel shall monitor the proper use of discretion by subordinates, ensuring that department personnel adhere to and abide by the appropriate rules, regulations and department policies and procedures.

Poe asserts that there is also a "policy" of the CSP prohibiting male officers from being alone with female civilians. Such a policy, if one existed, would suggest that Leonard failed to follow his duty under subsection 10 of the guidelines because he did not take any action after viewing the static crime scene video, which, Poe argues, should have indicated to Leonard that Pearl was alone with a female civilian. Even if Poe could point to evidence that Leonard "should have known" that Pearl was alone with the motel employee from the videotape, a contention we have already rejected, *see supra* note 5, her assertion regarding the existence of such a policy does not withstand scrutiny.

At oral argument, Poe conceded that there was no policy against male officers being alone with female civilians. Tr. of Oral Argument at 25. Despite this concession, Poe contends that this "policy" is a CSP "norm" and cites a CSP sergeant's confidential investigative report of a misconduct complaint filed against Pearl in 1983 alleging that he made improper advances toward a woman he escorted to and from a hospital. The sergeant failed to conclusively establish the complainant's allegations but concluded that "[w]hat can be demonstrated is that the Trooper did not utilize the best of [judgment] nor follow standard procedure in placing himself alone in the room with a female victim...."[6] There is no evidence that Leon-

---

**6.** After he had reviewed the sergeant's report, the lieutenant of his troop recommended that Pearl be found guilty of "Conduct Unbecoming an Officer" and be suspended. The Lieu-

ard knew or should have known of this "standard procedure" or "norm," nor that he read this confidential report. Certainly, there is no evidence of such a procedure's official recognition.

### C. Expert Testimony

During its review of Leonard's motion for summary judgment, the District Court also had before it the report and testimony of Poe's expert witness, Dr. Mayo, president of a police management consulting firm.[7] Dr. Mayo opined that Leonard was negligent in his failure to perform a proper review of the performance history of his subordinates, and in his failure to supervise Pearl properly, including Leonard's delegation of "essentially carte blanche" authority to Pearl to film the videos as Pearl saw fit. Dr. Mayo highlighted the fact that Leonard did not restrict Pearl's authority even after Leonard viewed the improper situation in the static crime scene video as a continuing example of Leonard's negligence in supervision. Leonard's failure to supervise Pearl more closely, Dr. Mayo reasoned, sent a message to Pearl that his illegal actions would not be discovered. Dr. Mayo concluded that the "gross negligence in supervision of (then) Trooper Pearl by Captain Leonard constitutes a pattern of deliberate indifference...."

To support his contentions that Leonard was negligent, Dr. Mayo invoked various national policing principles. For example, Dr. Mayo testified during the *Daubert*

hearing[8] that, contrary to "recommended national standards" cited by Mayo, Leonard failed to review the history of the personnel under his command when he first assumed his position. Dr. Mayo also testified that "basic police procedures" require "very strong management controls over any interaction" between a male officer and a female civilian. Dr. Mayo also cited national recommendations suggesting that supervisors should be constantly aware of the location and activities of those under their supervision. Despite his repeated invocations of national standards of proper police conduct, Dr. Mayo was unable to cite any example of a police department that practiced the standards he advocated.

### II. Procedural History

In 1997, the District Court denied Pearl's and Leonard's motion for judgment on the pleadings, concluding that Poe had stated a claim for the violation of her constitutional right to privacy under the Fourteenth Amendment in her unclothed body and that this right was clearly established before the incident occurred. *Poe v. Pearl*, No. 94 Civ.2058(AHN), 1997 WL 76576, at *5–*6 (D.Conn. Jan.29, 1997). Leonard did not immediately appeal this decision, but moved for summary judgment after discovery in 1999. Leonard also moved *in limine* to exclude the testimony of Poe's expert witness, Dr. Mayo.

After conducting a *Daubert* hearing, the District Court denied Leonard's motion *in*

tenant did not discuss any "norm" but rather analyzed Pearl's "pattern of conduct" toward the complainant, which indicated that he made romantic advances toward her while on duty.

7. The District Court denied Leonard's motion *in limine* to exclude Dr. Mayo's testimony.

8. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469

(1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (requiring a trial judge to perform a "gatekeeping" inquiry into both the relevance and reliability of expert testimony based on technical or other specialized knowledge in addition to testimony based on scientific knowledge).

*limine,* finding that Dr. Mayo's testimony, which was based on his personal knowledge and experience, satisfied the requirements set forth in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The District Court found that Dr. Mayo's inability to identify a police department that had adopted his standards did not bar his testimony because reasonable standards, rather than the prevailing practices or customs, were the legally appropriate bases for his opinion. The District Court concluded that vigorous cross-examination, the opportunity to present opposing evidence, and careful jury instructions regarding the weight to be given to Dr. Mayo's testimony would allay Leonard's concerns about his testimony.

With Dr. Mayo's testimony before it, the District Court found that genuine disputes of material fact existed that precluded a finding that Leonard's supervision of Pearl was not grossly negligent or deliberately indifferent. *Poe v. Pearl,* No. 94 Civ. 2058(AHN), slip op. at 11, 16 (D.Conn. July 20, 2000). The District Court also ruled on Leonard's defense of qualified immunity, concluding that "the issue of whether Leonard acted objectively reasonabl[y] is inextricably intertwined with the merits of [Poe's] claim" because both "issues require determination of whether a reasonable officer would believe that Leonard's supervision of Pearl was reasonable and whether Leonard's supervision violated fundamental standards of police supervision reflecting gross negligence or deliberate indifference." *Id.* at 15. Leonard timely appealed.

## DISCUSSION

We review *de novo* the District Court's decision to deny a government official's motion for summary judgment on the basis of qualified immunity. *Cerrone v. Brown,* 246 F.3d 194, 198 (2d Cir.2001).

## I. Appellate Jurisdiction

Before we address the merits of this interlocutory appeal, we must determine whether we have appellate jurisdiction to do so.

■ The qualified immunity doctrine shields governmental officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). As we have recently explained, this doctrine "strikes a balance between the need, on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury." *Locurto v. Safir,* 264 F.3d 154, 162–63 (2d Cir.2001) (internal quotation marks omitted).

■ "Because qualified immunity is a shield not only from liability, but also from the burdens of discovery and trial, a denial of immunity" may be reviewable on interlocutory appeal if it otherwise satisfies the test of the collateral order doctrine as restated by *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). *Locurto,* 264 F.3d at 163. Generally, a district court's denial of qualified immunity will satisfy the *Coopers & Lybrand* test to the extent that the denial turns on an issue of law. *See Locurto,* 264 F.3d at 163; *Tierney v. Davidson,* 133 F.3d 189, 194 (2d Cir.1998).

■ A more difficult question is presented when the district court's legal rul-

ing depends upon an assessment of facts and a finding that disputed material facts exist. However, "a district court's mere assertion that disputed factual issues exist[ed] [is not independently sufficient] to preclude an immediate appeal." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir.1996). We have held that an immediate appeal may lie "where the defendant contends that on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find, the immunity defense is established as a matter of law because those facts show either that he 'didn't do it' or that it was objectively reasonable for him to believe that his action did not violate clearly established law." *Id.* at 90–91. Where a defendant instead argues that the district court committed an error of law in ruling that the plaintiff offered sufficient proof to create a jury issue on the facts that are relevant to the defendant's immunity defense—in other words, that the district court erred in its determination of evidence sufficiency—an interlocutory appeal does not lie. *Id.*

■ In this case, Leonard both in his brief and at oral argument has conceded Poe's version of the facts for purposes of this appeal. Despite the District Court's assertion that a genuine dispute exists as to whether a reasonable supervisor would have supervised Pearl differently, this dispute is essentially a legal one. *See, e.g., Tierney*, 133 F.3d at 194 (holding jurisdiction existed where the remaining "factual" disputes amounted to the ultimate contested issue of whether it was objectively reasonable for the defendants to believe that their actions were legal and finding that because the "facts that bear on the circumstances [were] not in dispute," the objec-

tive reasonableness of the defendants' actions should be determined as a matter of law); *Lennon v. Miller*, 66 F.3d 416, 422 (2d Cir.1995) ("However, in the absence of a material factual dispute, the question of whether it was objectively reasonable for the officers to believe that they did not violate the plaintiff's rights is a purely legal determination for the court to make."). Like the defendants in *Lennon* and *Tierney*, Leonard argues only that the District Court erred in its application of the qualified immunity standard to the facts that are not currently in dispute. Because resolution of this question requires a conclusion of law, we have jurisdiction over this interlocutory appeal.

## II. Qualified Immunity

### A. *Overview*

Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were "clearly established" at the time. *See Vega v. Miller*, 273 F.3d 460, 466 (2d Cir.2001); *Kalka v. Hawk*, 215 F.3d 90, 98 (D.C.Cir.2000) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In evaluating a motion for summary judgment on the basis of qualified immunity, we must as a threshold matter inquire whether, construing the facts most favorably to the plaintiff, "the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If so, we must determine whether the right in question was clearly established at the time the violation occurred, that is, whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." [9] *Id.* Our cases have fur-

**9.** Although the "objective reasonableness" component of the qualified immunity inquiry

ther refined the second inquiry. We have found that a qualified immunity defense is established when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting *Salim,* 93 F.3d at 89). As the Supreme Court has explained, the "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.... If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to" immunity. *Saucier,* 121 S.Ct. at 2158. "Thus, if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant['s] conduct under the circumstances," qualified immunity applies. *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995).

Although *Saucier* did not change the analysis a court applies in examining a qualified immunity defense, it changed the procedure a court should follow. The Supreme Court emphasized that the qualified immunity inquiry "must be considered in proper sequence." *Saucier,* 121 S.Ct. at 2155. The need for this prescribed order is illustrated by the circumstances presented in this case. Pearl's intentional violation of Poe's rights, although it occurred while Pearl was performing his official functions, did not involve the typical situation confronted by courts when evaluating section 1983 claims brought against police officers in their individual capacities because it did not involve any investigation, stop, arrest or confinement. Moreover, the officer whose immunity we decide is Pearl's supervisor. Were we immediately to decide. whether Leonard's actions were objectively reasonable, we would fail to provide any guidance to the supervisors of future Pearls about what the law requires.

B. *Has Poe Alleged a Violation of a Clearly Established Right?*

First, we must determine whether Poe alleges sufficient facts to show a violation of her constitutional rights. Poe must show a violation of a right secured by either the Constitution or a federal statute. *Rodriguez v. Phillips,* 66 F.3d 470, 475 (2d Cir.1995) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). That said, the question arises: what law must be proven to have been violated and by whom? May Poe defeat Leonard's qualified immunity defense by showing only that Pearl violated her right to privacy or must she show that Leonard is liable under a theory of supervisory liability, or both? Although we previously have recognized this ambiguity, we did not resolve it. *See Ford v. Moore,* 237 F.3d 156, 163 n. 4 (2d Cir.2001).[10] As we will

may at times seem to merge with a factual inquiry on the merits, the Supreme Court has repeatedly cautioned that these are distinct questions and that the defense of qualified immunity must be evaluated early in the proceedings. *See, e.g., Saucier,* 121 S.Ct. at 2155–56, 2158–59; *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (rejecting the contention that officers who were found to have conducted an unreasonable search could not, as a matter of law, be entitled to qualified immunity, as qualified immunity protects those officers who reason-

ably yet mistakenly believe their conduct is reasonable).

10. In *Ford,* we noted that two prior decisions had examined "the clarity of the law allegedly violated by the subordinates [or co-officers] and then move[d] on to the objective reasonableness of the [supervisor's or co-officer's] actions." *Ford,* 237 F.3d at 163 n. 4 (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997)). However, the precise interaction between the

discuss, the violation of Poe's right to bodily privacy by the subordinate, Pearl, on the facts alleged is clear, the right violated was clearly established at the time Pearl acted, and his conduct can only be viewed as objectively unreasonable. Whether the precise theory under which Leonard may be held liable was clearly established is a much closer question. Thus, unlike in *Ford,* we must resolve the ambiguity.

■ We conclude that Poe must show that both laws were clearly established to lay the predicate for demonstrating that Leonard lacked qualified immunity: the law violated by Pearl and the supervisory liability doctrine under which she wishes to hold Leonard liable. We thus join with the Circuits that have addressed this question and have held that a supervisor may not be held liable unless both legal theories were clearly established, *see Camilo–Robles v. Hoyos,* 151 F.3d 1, 6 (1st Cir. 1998), *cert. denied,* 525 U.S. 1105, 119 S.Ct. 872, 142 L.Ed.2d 773 (1999); *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 454 (5th Cir.), *cert. denied sub nom. Lankford v. Doe,* 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994); *Shaw v. Stroud,* 13 F.3d 791, 801 (4th Cir.), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994) and 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994), but write to explain our reasoning.

The qualified immunity analysis depends upon an individualized determination of the misconduct alleged. Because the establishment of both the violation and the defense depend upon evaluating the harm inflicted and the individual responsibility of

the accused public official, both the subordinate's and the supervisor's actions (or lack thereof) are relevant. For example, to establish liability, Poe must prove proximate causation. *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *see* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable ..."). Poe's alleged harm certainly results from Pearl's misconduct in surreptitiously videotaping her. But, according to Poe, this harm might not have occurred had Leonard supervised Pearl more closely. *See Camilo–Robles,* 151 F.3d at 7 (holding that "the plaintiff must affirmatively connect the supervisor's conduct to the subordinate's violative act or omission") (internal quotation marks omitted).

To find Leonard ineligible for immunity solely because Pearl acted unlawfully seems patently unfair as well as illogical. *See Blyden,* 186 F.3d at 264 ("The sadistic and malicious standard articulated in *Hudson [v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) for excessive force claims arising under the Eighth Amendment] makes little sense, therefore, in the context of supervisory liability under Section 1983 based on, *inter alia,* failing to remedy a known wrong or being grossly negligent in managing subordinates who caused the unlawful condition or event."

supervisor's and the subordinate's (or co-officers' in *Ricciuti* ) alleged violations does not appear to have been resolved by the panel in either case. *See Moffitt,* 950 F.2d at 885–86 (dismissing appeal for lack of jurisdiction because factual issues remained regarding the commissioners' personal involvement); *Ricciuti,* 124 F.3d at 129 (holding that a defendant

accused of not intervening to prevent an illegal arrest must show that reasonably competent police officers faced with the information available could disagree about the legality of the arrest; also citing a decision that clearly established the non-intervening officer's potential liability for failing to intercede to prevent an unlawful arrest).

(internal quotation marks omitted)). Just as Leonard's liability depends in part upon his actions and choices, his eligibility for immunity must depend upon those same choices. *See, e.g., Martinez v. Simonetti,* 202 F.3d 625, 635 (2d Cir.2000) (concluding that police supervisors who relied on allegedly false reports of arresting officers at the scene did not act objectively unreasonably in determining that sufficient probable cause existed to arrest plaintiff); *Camilo–Robles,* 151 F.3d at 7. Moreover, a focus on both officers' conduct complements the policies behind permitting public officials the refuge of qualified immunity in their public functions. Qualified immunity exists in part to protect society from the "substantial social cost[ ]" that governmental officials, fearing "personal monetary liability and harassing litigation[,] will unduly [be inhibited] in the discharge of their duties." *Anderson,* 483 U.S. at 638, 107 S.Ct. 3034. Thus, our focus must be on the behavior of the governmental official in question, who will be shielded "from civil damages liability as long as [his] actions could reasonably have been thought consistent with the rights [he is] alleged to have violated." *Id.* We conclude that we must determine whether both laws, the law violated by Pearl and the specific supervisory liability theory under which Poe wishes to hold Leonard liable, were clearly established by March 1993, the time of the incident.

If we find that Poe has sufficiently alleged a violation of her constitutional rights by both Pearl and Leonard, we must determine whether Leonard may be held liable for his actions. To do so, we must examine whether these actions were objectively reasonable "in light of the legal rules that were 'clearly established'" at the time he acted. *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034 (citation omitted). The Supreme Court has directed us to define the relevant legal rule at the appropriate level of particularity. *See id.* at 639, 107 S.Ct. 3034 (explaining that, for example, "the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right," but at this level of generality, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights"). The Court has instructed that the right allegedly violated must be defined

> in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. 3034 (citation omitted). As we noted in *Johnson v. Newburgh Enlarged School District,* the

> recurring difficulty with this general directive, however, lies in reasonably articulating the right in relation to the factual situation at hand. Characterizing the right too narrowly to the facts of the case might permit government actors to escape personal liability, while doing so too broadly risks permitting unwarranted imposition of monetary liability.

239 F.3d 246, 251 (2d Cir.2001) (citation omitted).

### 1. Violation of Poe's Right to Privacy by Leonard's Subordinate

■ At oral argument, Leonard conceded for purposes of this appeal that Poe

has sufficiently alleged a violation of her constitutional right to privacy, Tr. of Oral Argument at 9, although he had fully briefed the issue.[11] Even with this concession, we discuss this aspect of Poe's claim in order to clarify that there is a right to privacy in one's unclothed body. Although our prior cases have held that there is such a right in the context of prison confinement and search or seizure by the government, those cases did not limit the right to a Fourth Amendment setting. Accordingly, we conclude that the right to privacy in one's unclothed body extends beyond a Fourth Amendment context to the case at hand.

The Fourth Amendment is not the proper source of Poe's constitutional right because Pearl's objectionable conduct occurred outside of a criminal investigation or other form of governmental investigation or activity. *Cf., e.g., Soldal v. Cook County,* 506 U.S. 56, 66–67 & n. 11, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (recognizing the applicability of the Fourth Amendment to a sheriff's unlawful seizure of a mobile home during eviction proceedings); *Skinner v. Ry. Executives Ass'n.,* 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (holding that federal regulations requiring employees of private railroads to provide urine samples for drug testing are subject to Fourth Amendment strictures); *O'Connor v. Ortega,* 480 U.S. 709, 714–15, 723, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion) (holding that public employer intrusions on the constitutionally protected privacy interests of government employees for non-investigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under the Fourth Amendment); *New Jersey v. T.L.O.,* 469 U.S. 325, 335, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (holding that the Fourth Amendment applies to governmental conduct whether "the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards") (internal quotation marks omitted); *Camara v. Mun. Court of San Francisco,* 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (applying Fourth Amendment to governmental inspection program). In all of these cases,

---

**11.** Poe asserts that Leonard should not be permitted to argue that the constitutional right allegedly violated was not clearly established because he failed to appeal the District Court's order denying his motion for judgment on the pleadings. His failure to do so, however, does not bar our review for at least two reasons. First, the Supreme Court has urged us to answer the threshold question of whether a violation of a constitutional right has been alleged when considering a qualified immunity claim. *See Saucier,* 121 S.Ct. at 2156. Second, the case Poe cites for support, *Armstrong v. Texas State Bd. of Barber Exam'rs,* 30 F.3d 643, 644 (5th Cir.1994), is inapposite. In that case, the defendants filed a motion to dismiss, based, *inter alia,* on qualified immunity, which was denied, but failed to appeal that ruling. Before the completion of discovery, the defendants filed a motion for summary judgment, which relied solely on the pleadings and again raised the same defense. The Fifth Circuit decided that under these unique circumstances, where the two motions were functional equivalents, it would not allow an appeal of the second motion. Even presuming we would follow *Armstrong,* the procedural history of this case does not reflect the "unique circumstances" that concerned the Fifth Circuit. Leonard, after the completion of discovery, filed a motion for summary judgment asserting that Poe failed to establish his deliberate indifference or gross negligence, and relied on materials obtained during discovery. His failure to appeal the initial motion for judgment on the pleadings does not preclude our review of the District Court's qualified immunity determination following a summary judgment motion. *See, e.g., Vega v. Miller,* 273 F.3d 460, 465–66 (2d Cir.2001); *Grant v. City of Pittsburgh,* 98 F.3d 116, 120–21 (3d Cir.1996) (concluding the same).

the challenged conduct occurred either during an investigation conducted by the government as an employer or during a law enforcement official's performance of a traditional governmental function. But there is no allegation here that Pearl videotaped Poe during the course of any investigation or other governmental endeavor of the sort implicating the Fourth Amendment. *See United States v. Attson,* 900 F.2d 1427, 1430 (9th Cir.) ("The types of non-law enforcement conduct to which the [Supreme] Court has extended the scope of the [Fourth] [A]mendment are thus typically motivated by some sort of investigatory or administrative purpose designed to elicit a benefit for the government."), *cert. denied,* 498 U.S. 961, 111 S.Ct. 393, 112 L.Ed.2d 403 (1990). Although Pearl invited Poe to film a training video to benefit the police academy, his surreptitious videotaping of her during his assigned duties was for his personal reasons and not to advance any governmental purpose. The Fourth Amendment simply is not implicated by his misconduct.

Instead, Poe's claim is appropriately analyzed pursuant to the Fourteenth Amendment's guarantee of substantive due process. *See, e.g., Johnson,* 239 F.3d at 251–52 (analyzing a student's claim that gym teacher used excessive force under the Fourteenth Amendment's substantive due process guarantee because the assault occurred in non-seizure, non-prisoner context); *Haberthur v. City of Raymore,* 119 F.3d 720, 723–24 (8th Cir.1997) (concluding that the plaintiff, who was not under arrest or under suspicion of criminal activity, adequately alleged that police officer's sexual assault violated her substantive due process right to bodily integrity or privacy); *Jones v. Wellham,* 104 F.3d 620, 628 (4th Cir.1997) (holding that claim brought by a plaintiff, who was not arrested or a criminal suspect but was raped by a police officer, was properly viewed as asserting a violation of her substantive due process right to bodily integrity under the Fourteenth Amendment, rather than as a violation of her Fourth Amendment rights); *cf. County of Sacramento v. Lewis,* 523 U.S. 833, 843, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[I]f a constitutional claim is covered by a specific constitutional provision ... the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.") (internal quotation marks omitted).

We discuss cases analyzing such a privacy interest under the Fourth Amendment in addition to those cases applying the Fourteenth Amendment's substantive due process standard to demonstrate that the type of privacy claim Poe asserts has been previously raised and accepted. Although the Fourth Amendment cases are not on all fours with Poe's claim under the Fourteenth Amendment, they are instructive because they reveal that individuals retain significant privacy interests even in situations where privacy expectations are diminished.

Several of our cases involve viewings of unclothed or partially unclothed individuals for penological purposes. In *Forts v. Ward,* for example, we recognized that female inmates had a privacy interest in protecting themselves from "the involuntary viewing of private parts of the body" by prison guards of the opposite sex. 621 F.2d 1210, 1217 (2d Cir.1980).[12] In *Security and Law Enforcement Employees v. Carey,* 737 F.2d 187, 192, 204–09 (2d Cir. 1984), we examined the constitutionality of

---

12. We did not so hold (but merely assumed for purposes of the appeal), however, because the state defendants did not appeal the lower court order declaring such a right. *Forts,* 621 F.2d at 1214.

two forms of warrantless disrobe searches of correctional officers for contraband. Although holding that most of the policies governing the warrantless strip and visual body-cavity searches [13] of correctional officers violated the Fourth and Fourteenth Amendments, we concluded that if prison officials had reasonable suspicion to conduct a strip search of a correctional officer, that search would not violate the Constitution. *Id.* We recognized that correctional officers, just like visitors to a prison, retain an expectation of bodily privacy. *Id.* at 202. That expectation was diminished in that case by the notice to the officers of the Department of Correctional Services' policy and the legitimate penological needs of a correctional facility. *Id.; see also Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir.1992) (holding that inmate subject to visual body cavity searches retained "a limited right of bodily privacy even in the prison context"). We have also recognized a privacy interest in cases where arrestees charged with misdemeanors were strip-searched without reasonable suspicion. *See, e.g., Walsh v. Franco,* 849 F.2d 66, 69 (2d Cir.1988); *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986). Poe, however, is not a correctional officer, whose duties include confiscating contraband and providing prison security and who is informed that, when at work, she could be searched. Thus, she has no reason to be aware of the potential for such a search. Nor is she a misdemeanor arrestee housed with a general jail population or with arraigned inmates. She is a private individual, not suspected of any criminal activity, who was invited by a police officer to assist in filming a police academy training video. Her expectation of bodily privacy, were we applying Fourth Amendment standards, would be high.

We have also indicated, although we have not held, that the publication of a photograph of a criminal suspect in the nude would violate the suspect's constitutional right to privacy. *See Rosenberg v. Martin,* 478 F.2d 520, 525 (2d Cir.) (Friendly, J.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973). In support of this proposition, we cited to the Ninth Circuit's decision in *York v. Story,* which held that a plaintiff, who went to the police department to file assault charges and was photographed by a police officer who told her that she would have to be photographed while in the nude, stated a violation of her right to privacy as guaranteed by the Fourteenth Amendment. 324 F.2d 450, 455 (9th Cir.1963), *cert. denied,* 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964). Notably, the Ninth Circuit concluded that

> We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.... We do not see how it can be argued that the searching of one's home deprives him of privacy, but the photographing of one's nude body, and the distribution of such photographs to strangers does not. Nor can we imagine a more arbitrary intrusion upon the security of that privacy than for a male police officer to unnecessarily photograph the nude body of a female citizen who has made complaint of an assault upon her....

*Id.* at 455. We find that these cases, read together, are sufficiently clear in establishing that there is a right to privacy in one's unclothed or partially unclothed body, regardless whether that right is established

---

**13.** This was defined as a strip search including "a visual examination of the anal and genital areas of the person searched." 737 F.2d at 192.

through the auspices of the Fourth Amendment or the Fourteenth Amendment.

Moreover, even if we did not have these cases on which to rely, we would find that Poe has independently asserted a violation of her substantive due process rights because Pearl's behavior, if proven, "shocks the conscience." The core protection provided by the Due Process Clause is protection against arbitrary government action. Thus, the "touchstone of due process is protection of the individual against . . . the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento*, 523 U.S. at 845–46, 118 S.Ct. 1708 (internal quotation marks and citations omitted). We must determine, therefore, whether Pearl's behavior "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 848 n. 8, 118 S.Ct. 1708.

Taking the facts most favorably to Poe, as we are required to do on a motion for summary judgment, it seems clear that Pearl manipulated the situation to ensure that Poe would be videotaped unclothed from the waist up: he told Poe to wear provocative clothing for her role in order to distract the trooper candidates and create a better training video; he encouraged her to bring several different outfits; even though she was already dressed provocatively, he encouraged her to change outfits; he told her to "lose the bra;" and he instructed her to change clothes in his office and then directed her to a precise spot to stand while doing so. Pearl did all this while purporting to act for the benefit of the police academy. Pearl's conduct certainly qualifies as "conduct intended to injure in some way unjustifiable by any governmental interest," which rises "to the conscience-shocking level." *County of Sacramento*, 523 U.S. at 849, 118 S.Ct.

1708; *see also Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir.2001) (holding that a gym teacher's violent physical assault of a student was sufficiently "conscience-shocking" to constitute a violation of the student's substantive due process right to be free of excessive force).

We hold that Poe has alleged sufficient facts to raise a triable issue whether Pearl violated her constitutional right to privacy in her unclothed body and that her right to privacy in her unclothed body was clearly established at the time Pearl videotaped her. Although our prior cases have not presented exactly the same facts and the Supreme Court has advised that for qualified immunity purposes the right must be established "in a more particularized, and hence more relevant sense," *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), we conclude, as we did in *Johnson*, that "for claims based on intentionally tortious harmful conduct employed in the absence of any legitimate government interest, the requisite degree of particularity is lessened," *Johnson*, 239 F.3d at 253. Our cases have sufficiently detailed the existence of such a privacy right and we independently find that Pearl's alleged behavior is shocking enough to qualify as a violation of Poe's substantive due process rights. Thus, it would be objectively unreasonable for a police officer to believe that Pearl's misconduct did not violate Poe's clearly established rights. Let us be clear: a police officer violates a person's constitutional right to bodily privacy when that officer manipulates the circumstances to view, to photograph, to videotape or otherwise to record that person's unclothed or partially unclothed body without his or her consent where, as here, there is no conceivable investigative or otherwise proper law-enforcement interest advanced by such a viewing.

## 2. Supervisory Liability

 A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort. *See Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir.1999) (explaining that because section 1983 imposes liability only upon those officials who actually cause a violation, the doctrine of *respondeat superior* is inapplicable). We have held that a supervisor may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury.[14] *See, e.g., Johnson*, 239 F.3d at 254; *Blyden*, 186 F.3d at 264–65; *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986) (concluding that a prisoner stated a section 1983 claim against the prison superintendent asserting a violation of his rights at a prison disciplinary hearing because the evidence could show either that the superintendent was directly responsible for the conduct or that he allowed an unconstitutional policy or custom to continue despite the frequency of violations during hearings); *Meriwether v. Coughlin*, 879 F.2d 1037, 1047–48 (2d Cir. 1989) (affirming finding of supervisory liability when evidence showed that supervisors knew or should have known that plaintiff inmates' reputations as alleged planners of a violent insurrection would expose them to extreme hostility from the guards, yet took no precautions for the inmates' safety). Thus, as a general proposition, Leonard may be found liable if, in supervising Pearl, he exhibited gross negligence or deliberate indifference to a high risk that Pearl would violate Poe's constitutional rights, and Leonard's neglect caused Pearl to violate Poe's rights.

Leonard contends, however, that it has not been clearly established that a supervisor is required to review the personnel files of his subordinates. In addition, Leonard argues that it was not clearly established that a supervisor's failure to provide special training to a subordinate in order to ensure that the subordinate would not commit a bizarre and possibly criminal act would violate the law. Finally, he asserts that our Circuit's case law applying a gross negligence standard in the supervisory context is "spartan" and thus not something of which a reasonable supervisor would be aware.

Although we have held that a supervisor may be liable for either his gross negligence or deliberate indifference in supervising a subordinate who violates a person's constitutional rights, we must determine whether it has been clearly es-

---

**14.** Although "gross negligence" and "deliberate indifference" at times are used interchangeably, they represent different degrees of intentional conduct on a continuum. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 n. 7 (5th Cir.) (noting that "gross negligence" and "deliberate indifference" "involve different degrees of certainty, on the part of an actor, that negative consequences will result from his act or omission;" while "the former is a 'heightened degree of negligence,' the latter is a 'lesser form of intent' ") (quoting *Germany v. Vance*, 868 F.2d 9, 18 n. 10 (1st Cir.1989)), *cert. denied sub nom., Lankford v.* *Doe*, 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994). We have often equated gross negligence with recklessness, and have defined it as the "kind of conduct ... where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Bryant v. Maffucci*, 923 F.2d 979, 985 (2d Cir.) (citing Restatement (Second) of Torts § 500, cmt. a (1965) and W.L. Prosser, Law of Torts § 34, at 187 (4th ed.1971)), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

tablished that Leonard's failure to supervise Pearl more closely would violate Poe's rights in the particularized context of the facts at hand. The essence of Poe's claim rests on the concept of notice: either that Leonard had notice of sufficient facts to require him to do more or that he should have, by virtue of his supervisory position, investigated Pearl's past further before permitting him to continue with the video assignment.

■ Case law[15] clearly establishes that a supervisor may be liable for failing to screen or otherwise inquire about his subordinates or into their actions. *See, e.g., Fiacco v. City of Rensselaer,* 783 F.2d 319, 329–31 (2d Cir.1986) (finding sufficient evidence to support a jury's finding that a police chief was deliberately indifferent to his officers' use of excessive force because the evidence showed that the chief failed to exercise reasonable care in investigating several claims of police brutality and instead conducted only a superficial questioning of the accused officers), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). As we explain in greater detail below, that precedent clearly establishes that for a supervisor to be liable under section 1983 for his failure to inquire, he must first have been on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior. Such notice could be actual (for example, awareness of prior deprivations in a related context), or it could be constructive (for instance, notice arising from a preexisting duty). *See, e.g., McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977) (holding that Commissioner of Corrections could not be held liable for damages for a violation of the plaintiff's due process rights at a prison hearing because there was no evidence that he participated directly in the hearings, that he had knowledge of what occurred at the hearings, that he had any reason to suspect that there had been wrongdoing, or that he had direct responsibility or control over the hearing committee), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Wright v. McMann,* 460 F.2d 126, 134–35 (2d Cir.) (rejecting immunity defense for prison warden who had knowledge, both through actual notice and by virtue of his position, of inhumane treatment in the prison's "strip cells"), *cert. denied,* 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972). Combining the teachings of these cases with our generalized explanation of the gross negligence standard in *Bryant v. Maffucci,* 923 F.2d 979, 985 (2d Cir.1991),

15. It is unclear the extent to which we may rely on the case law of other circuits to determine whether the law was clearly established. The Supreme Court cases from which the "clearly established" rule derives, *Anderson* and *Harlow,* do not provide a clear answer, as the *Anderson* Court does not discuss the issue, 483 U.S. at 639–40, 107 S.Ct. 3034, and the *Harlow* Court expressly avoids deciding the question, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818 n. 32, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Our opinions have differed on this issue. *Compare Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (evaluating "whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question") *with Varrone v. Bilotti,* 123 F.3d 75, 79 (2d Cir.1997) (rely-ing upon decisions of other circuits to determine whether the law was clearly established); *Weber,* 804 F.2d at 803–04 (same). Even in *Varrone,* however, we relied in part on the fact that our precedent had foreshadowed the development of the relevant standards that other circuits had clearly established. *See Varrone,* 123 F.3d at 79. Given that the factual situation presented here is unusual in the sense that Pearl was not performing the police functions we usually encounter in such cases and that Leonard, who is indirectly implicated in Pearl's violation, is the individual whose understanding needs to be evaluated, we rely primarily on our cases to ascertain whether the law was clearly established but discuss other circuits' cases because they are instructive.

we conclude that the appropriate inquiry is as follows: Poe must allege sufficient facts to raise a triable issue of fact as to whether Leonard knew or should have known that there was a high degree of risk that Pearl would behave inappropriately with a woman during his assignment, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Poe. *See, e.g., Taylor Indep. Sch. Dist.,* 15 F.3d at 454 (establishing a similar test for supervisory school officials whose subordinate sexually abused a student); *McCann v. Coughlin,* 698 F.2d 112, 125 (2d Cir.1983) (holding that a prison commissioner and superintendent could be held liable for their gross negligence and deliberate indifference to the constitutional rights of inmates, as indicated by their having actual or constructive notice that unconstitutional practices were taking place, and their failure to act on the basis of this information); *cf. Meriwether,* 879 F.2d at 1047–48 (upholding a compensatory damage award for a § 1983 violation when the evidence showed that the commissioner and superintendent should have known that the plaintiff inmates' violent reputation (which was fostered in part by the commissioner's press secretary's statement to the media and by the descriptions of the inmates in their transfer orders) would provoke extreme hostility from correctional officers, yet the commissioner and superintendent took no precautions for the inmates' safety). Poe's difficulty, however, is that she has failed to proffer sufficient evidence to meet this standard.

▮ To establish that Leonard's conduct violated the clearly established requirements we have just summarized, Poe relies primarily on Leonard's failure to review Pearl's personnel file, his failure to supervise Pearl more closely after viewing the static crime scene video, and Dr. Mayo's opinion that these failings fell short of proper police management standards.[16]

First, we address whether Leonard's failure to review Pearl's personnel history, upon assuming his supervisory command, by itself, establishes a deliberate or reckless disregard of a high risk of a constitutional violation by Pearl. Prior case law indicates that a supervisor is not liable for failing to review an inherited subordinate's personnel history upon assuming command, absent some independent reason for him to do so.

Rather than examining what a supervisor could have learned had he reviewed his subordinate's personnel history, most courts have instead evaluated how the supervisor responded to the knowledge he possessed. In *Shaw v. Stroud,* 13 F.3d 791 (4th Cir.), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994) and 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994), for example, the Fourth Circuit evaluated the immunity claims of two police supervisors who had differing degrees of knowledge regarding their subordinate's proclivity for using excessive force on arrestees. The court concluded that Sergeant Stroud's motion for summary judgment, based on qualified immunity, was properly denied because there was evidence that he knew of numerous prior complaints involving this subordinate, responded callously or with amusement to at least three of these reports, and failed to investigate the incidents. *See id.* at 795–96, 800, 802. In contrast, the court found that Sergeant Smith, who replaced Stroud approximately one year before the subor-

---

**16.** We have already discussed the lack of evidence that Leonard was aware of an alleged CSP policy or norm prohibiting a male officer from being alone with a civilian female.

dinate shot and killed the plaintiff's husband, was entitled to summary judgment based on qualified immunity because he responded (although somewhat ineffectively) to the third-party complaints of which he was informed.[17] *See id.* at 796, 801; *see also Camilo–Robles v. Hoyos,* 151 F.3d 1, 11–15 (1st Cir.1998) (holding that various supervisors and psychiatrists were not entitled to summary judgment based on qualified immunity because the evidence showed that they were reckless and wanton in re-arming a police officer they knew had an extensive history of violent and bizarre behavior who had then beaten and wrongfully arrested the plaintiff), *cert. denied,* 525 U.S. 1105, 119 S.Ct. 872, 142 L.Ed.2d 773 (1999); *Otey v. Marshall,* 121 F.3d 1150, 1156–57 (8th Cir.1997) (concluding that a police chief was entitled to qualified immunity because the plaintiff failed to adduce evidentiary support for the assertion that the police chief received notice that his subordinate was prone to using excessive force when the plaintiff offered evidence that the subordinate had previously fired warning shots contrary to department policy and that there was a prior but undated complaint of excessive force); *McCann,* 698 F.2d at 125 (prison supervisory officials may be liable if they fail to act when they have actual notice that unconstitutional practices are occurring). Because Leonard was unaware of Pearl's troubled past, there is insufficient evidence for us to conclude that, *based on what Leonard knew about Pearl,* Leonard's failure to review Pearl's personnel file was reckless or deliberately indifferent toward Poe's rights.

We, however, have also found the existence of constructive notice dispositive. In *Wright v. Smith,* 21 F.3d 496 (2d Cir.1994), the plaintiff inmate sued the commissioner of New York's Department of Correctional Services under section 1983, alleging that his extended confinement without a hearing in a prison's special housing unit violated his Fourteenth Amendment liberty interest. *Id.* at 497. Wright argued that the commissioner was personally involved in the violation of his rights because the commissioner had received his letter, addressed to the governor of New York, in which Wright complained generally about the conditions of his confinement but did not state that he was being confined without a hearing or indicate that he had been deprived of the rights connected with a hearing. We found that the commissioner was not put on actual or constructive notice of the violation by that letter. *Id.* at 501. In contrast, we found that the prison superintendent received constructive notice because a copy of the plaintiff's habeas corpus petition was served on the superintendent. *Id.* at 502. Although the petition did not allege that the plaintiff had been denied a hearing, it alleged that the plaintiff was denied many rights connected with a hearing. We concluded that the superintendent should therefore not have been granted qualified immunity on summary judgment. *Id.* But here there are no facts indicating that Leonard had constructive notice of Pearl's problematic history or knowledge of any facts that should have compelled him to inquire into Pearl's background.

In some cases, notice will also be imputed to an individual because of the particular duties he is assigned by virtue of his position. *See Wright,* 460 F.2d at 135. In *King v. Higgins,* 702 F.2d 18, 21 (1st Cir.), *cert. denied sub nom. Vinzant v. King,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983), the First Circuit dismissed an argument by a prison superintendent that he

---

**17.** When Smith replaced Stroud, Stroud did not inform Smith of any of the excessive force complaints against the subordinate. *See id.* at 796.

neither knew nor should have known that the plaintiff had been denied his constitutional rights in his disciplinary hearing because the plaintiff's complaint was too general. The First Circuit responded,

> Defendant confuses a lack of knowledge of the failure of other officials to ensure plaintiff's constitutional rights with a lack of duty on his part to assure that the proceedings below were constitutionally sound. As the official designated to hear prisoners' appeals, he had a duty to conduct at least a minimal investigation to determine whether there was any merit to plaintiff's appeal.

*Id.* The court contrasted this defendant's situation with that of a warden who had no responsibility to review the findings and procedures of a disciplinary committee and was thus found to have fulfilled his supervisory responsibilities. *Id.* at 21 n. 3. Because the reports the defendant supervisor requested as part of his duties were sufficient to have put the defendant on notice of the alleged constitutional violations, the defendant had recklessly disregarded the plaintiff's rights by failing to investigate his complaint. *Id.* at 21; *see also Greason v. Kemp,* 891 F.2d 829, 839–40 (11th Cir. 1990) (affirming denial of summary judgment for a prison warden because, as warden, he was primarily responsible for staffing the prison, and thus should have been aware of the understaffing problem with the prison's psychiatric care and its resulting effects); *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (finding that a jury could infer that a prison superintendent was directly responsible for the constitutional violations occurring during prison disciplinary hearings or that he permitted an unconstitutional policy or practice given the frequency with which inmates' rights were violated). In this case, however, Poe does not point us to any CSP policy requiring Leonard to review Pearl's personnel file upon assuming command or to any

responsibility encompassed in his supervisory role that would have caused him to be aware or become aware of a subordinate's indiscretions that occurred at least three years prior to his assumption of command.

One Circuit, however, found a supervisor ineligible for qualified immunity because he failed to conduct a background check on an applicant. *See Parker v. Williams,* 862 F.2d 1471, 1477, 1480 (11th Cir.1989) (finding that a sheriff was ineligible for qualified immunity because he failed to conduct a background check on a mentally unstable person he hired, who then kidnapped and raped a pre-trial detainee), *overruled on other grounds by Turquitt v. Jefferson County,* 137 F.3d 1285, 1291 (11th Cir.1998) (*en banc*). *Parker* is distinguishable because it involved a supervisor's failure to screen a job applicant with a problematic history, rather than his failure to re-screen a problematic officer who was part of a pre-existing staff. In the case at bar, Leonard did not hire Pearl, but instead began to supervise him as part of the staff Leonard inherited from his predecessor. It is not unreasonable for a subsequent supervisor to rely on his predecessor to inform him of subordinates with problematic behaviors or histories. Supervisors cannot be expected to reinvent the wheel with every decision, for that is administratively unfeasible; rather, they are entitled to rely upon the decisions of their predecessors or subordinates so long as those decisions do not appear to be obviously invalid, illegal or otherwise inadequate. *See Martinez v. Simonetti,* 202 F.3d 625, 635 (2d Cir.2000) (finding that it was erroneous for the trial court to conclude that police supervisors had a duty to conduct an independent investigation before charging a suspect); *Varrone,* 123 F.3d at 81; *Cecere v. City of New York,* 967 F.2d 826, 829 (2d Cir.1992).

In addition to Leonard's failure to review Pearl's personnel file, Poe argues that once Leonard viewed the static crime scene video, with its overlong focus on the civilian victim's upper thigh region, and learned of Pearl's desire for Poe to show "a lot of cleavage" in her video, Leonard had sufficient notice of a problematic situation developing that his failure to supervise or train Pearl further amounted to gross negligence. But these facts simply do not provide the sort of actual or constructive notice that our cases, and those of other Circuits, have required. *See, e.g., Wright,* 21 F.3d at 501 (finding that a prison commissioner did not have actual or constructive notice that the inmate plaintiff had been denied a hearing when the letter the commissioner received only complained generally about the conditions of his confinement). There is nothing unduly sexually provocative about the static crime scene or the "cleavage" request in the situation presented here. In the context of a training video intended, in part, potentially to shock or distract trainees, they would not indicate to a reasonable supervisor that he, in failing to act, consciously disregarded a high degree of risk of harm to a woman such as Poe. This is especially true in the context at issue here: Pearl was preparing a realistic crime scene to test trooper candidates' observational skills, and crime scenes often contain disturbing details. There is also nothing in our case law to suggest that, absent notice of his subordinate's problematic proclivities, a reasonable supervisor would understand that his delegation of "blanket" or "carte blanche" authority to make a training video violated clearly established law.

■ Third, Poe relies heavily on Dr. Mayo's invocation of "recommended national standards" of police management to prove that Leonard was grossly negligent in his supervision of Pearl. Dr. Mayo

relies on such standards to establish that supervisors should, for example, review the personnel files of their subordinates when assuming command. Because Dr. Mayo's testimony does not evince how Leonard acted or failed to act, but only how supervisors who follow his generalized principles of police management might act, it is of limited utility in assessing whether Leonard "knew" there was a high degree of risk that Pearl would behave inappropriately with a woman on assignment—a key question in the analysis we have identified. Construing the evidence most favorably to Poe, we find that the most she has established is that Leonard was negligent in not reviewing Pearl's personnel file when Leonard had no indication that Pearl had prior problems interacting with civilian women. But mere negligence is insufficient as a matter of law to state a claim under section 1983. *See, e.g., Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (holding that negligence on the part of prison officials is insufficient to establish liability under section 1983). Poe's expert, unsurprisingly, decries Leonard's failure to do more: to review Pearl's personnel file, to discuss with Pearl how Pearl should interact with civilian women, to require Pearl to use only CSP troopers in filming his videos, etc. But a plaintiff is almost always able to point to what more an officer or supervisor could have done. That is not the issue. Under section 1983, the issue is whether the "more" that Leonard could have done was clearly established by law at the time he acted or failed to act so that it can be said that Leonard had notice that his actions or omissions rose to the level of a constitutional violation. While Dr. Mayo's standards may be relevant in establishing what a reasonable supervisor might do, they do not clearly establish the law in this Circuit. *See Belcher v. City of Foley,* 30 F.3d 1390, 1399 (11th Cir.1994)

(finding that "non-legally enforceable standards are not the law and cannot clearly establish it"). Poe therefore may not rely solely on these standards to prescribe the level of conduct Leonard was required to meet unless these standards have been prescribed by statute or regulation or adopted by a court. But Poe has failed to call our attention to any case clearly establishing that a supervisor may be held liable, on facts similar to those Leonard confronted, for not following the generalized principles of police management that her expert espouses.

Even considering all of Leonard's failings together, construing all facts and drawing all reasonable inferences in Poe's favor, we conclude that Poe has failed to proffer sufficient evidence to raise a triable issue regarding Leonard's alleged gross negligence or deliberate indifference. The facts Poe alleges are insufficient as a matter of law to have put a reasonable supervisor on notice that there was a high risk that one of his subordinates would violate another's constitutional rights. Accordingly, Poe fails to establish that Leonard acted with the sort of gross negligence or deliberate indifference necessary to support supervisory liability under clearly established law.

### C. Was It Objectively Unreasonable for Leonard to Believe that his Conduct Did Not Violate the Law?

█ Even if we found that Poe demonstrated that Leonard's inactions violated clearly established law, we would conclude that Leonard was entitled to qualified immunity because his conduct was not objectively unreasonable. When evaluating a claim of qualified immunity, "the appropriate question is the objective inquiry of whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law" and "the

circumstances confronting [him] at the scene." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir.2000) (internal quotation marks omitted). "A defendant is therefore entitled to summary judgment on qualified immunity grounds if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions." *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir.2001) (internal quotation marks omitted). "[W]e have held that when the facts that bear on the circumstances are not in dispute, the issue of whether the defendant[ ] acted reasonably should be determined by the court on a motion for summary judgment." *Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir.1998). The District Court erred in not conducting the legal inquiry necessitated by the defense of qualified immunity, which requires that a court determine whether, under the plaintiff's version of the facts, reasonable officers in the defendant's position could disagree as to the legality of his actions.

█ Reasonable supervisors confronted with the circumstances faced by Leonard could disagree as to the legality of his inaction. Indeed, even different circuits disagree about whether it is objectively reasonable for a supervisor, upon assuming his new post, to neglect to review his subordinates' personnel histories. *Compare Shaw v. Stroud*, 13 F.3d 791, 802–03 (4th Cir.1994) (concluding that the actions of a newly appointed supervisor, who heard some informal complaints about a subordinate officer but conducted a minimal investigation into those complaints, were objectively reasonable) *with Parker v. Williams*, 862 F.2d 1471, 1477 (11th Cir.1989) (affirming denial of qualified immunity after trial because a reasonable sheriff could not have concluded that hiring an individual with a troubled back-

ground, of which the sheriff knew or could have discovered with minimal investigation, would not violate the plaintiff's rights), *overruled on other grounds by Turquitt v. Jefferson County*, 137 F.3d 1285, 1291 (11th Cir.1998) (*en banc*). Although the lingering shot of the victim's upper thighs in the static crime scene might concern some supervisors, we conclude that a reasonable supervisor, who was unaware of Pearl's past misbehavior with women, would not have found anything unusual when viewing the videotape in the context of preparing a realistic crime scene for police candidates to observe closely, particularly given that such scenes are often violent or gruesome. Much of Poe's evidence derives from Dr. Mayo's testimony that Leonard's conduct did not meet recommended national standards. But Dr. Mayo's inability to identify one police department that follows the standards he advocates demonstrates that there is a range of supervisory conduct that reasonable officers believe is acceptable. Considering all of Leonard's alleged inadequacies together, we conclude that, at best, reasonable supervisors could disagree as to whether Leonard violated clearly established law.

### III. Admission of Expert Testimony

Leonard also appeals the District Court's denial of his motion to exclude the testimony of Poe's expert witness, Dr. Mayo. Because Leonard must accept Dr. Mayo's testimony in order for us to have jurisdiction over this interlocutory appeal, we find that it is inappropriate for us to address this issue. *See Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 758 (2d Cir.1998) (holding that a court of appeals may exercise its discretion to hear an interlocutory appeal of an otherwise non-appealable issue only when that issue "is inextricably intertwined with, or—what is essentially the same thing—its

review is necessary to ensure meaningful review of, the former issue"), *cert. denied,* 527 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999). The admissibility of the expert testimony is not necessary to ensure meaningful review of the qualified immunity determination, as we have concluded that Leonard is entitled to qualified immunity even considering Dr. Mayo's testimony.

### CONCLUSION

For the foregoing reasons, we conclude that we have jurisdiction to review the merits of Leonard's qualified immunity defense, and that his defense should be upheld as a matter of law. We reverse and remand to the District Court with instructions to dismiss with prejudice the complaint as to Captain John Leonard.