**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3921
_____

JANE DOE,
          Appellant

v.

LUZERNE COUNTY; RYAN FOY, in his Individual
Capacity; BARRY STANKUS, in his Individual
Capacity,


_____


On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No. 3-08-cv-01155
District Judge: The Honorable A. Richard Caputo

Argued September 13, 2011

Before: SLOVITER, SCIRICA, and SMITH,
*Circuit Judges*

(Filed:  October 12, 2011)

Cynthia L. Pollick  (Argued)
The Employment Law Firm
363 Laurel Street
Pittston, PA  18640
        *Counsel for Appellant*

Mark W. Bufalino (Argued)
John G. Dean
Paul A. Galante
Elliott Greenleaf & Dean
39 Public Square
Suite 1000
Wilkes-Barre, PA  18702
        *Counsel for Appellee*

Marc Rotenberg
John Verdi (Argued)
Electronic Privacy Information Center
1718 Connecticut Avenue, N.W.
Suite 200
Washington, DC  20009
        *Counsel for Amicus Appellant*

_____

OPINION

_____

SMITH, *Circuit Judge.*

Appellant Jane Doe, a deputy sheriff in the Luzerne County Sheriff's Department (the "Department"), brought this action against appellees Luzerne County (the "County"), Ryan Foy, who was a deputy chief for the Department at the time of the events at issue, and Barry Stankus, who was the sheriff of Luzerne County also at that time (collectively, the County, Foy, and Stankus are "County Defendants"). Doe sought remedies pursuant to 42 U.S.C. § 1983 and claimed, among other things, that County Defendants violated both her federal constitutional right to privacy under the Fourteenth Amendment and her right to be free from unlawful searches and seizures under the Fourth Amendment, and that the County failed to properly train its employees. The District Court granted the County Defendants' motion for summary judgment, dismissing the case in its entirety. We will reverse the District Court's order dismissing Doe's constitutional right to privacy claim under the Fourteenth Amendment and remand the case for further proceedings. We will affirm the District Court's order in all other respects.

## I. BACKGROUND

On September 27, 2007, the Department, which has employed Doe as a deputy sheriff since 2002, instructed Doe to serve a bench warrant on a resident in Wilkes-Barre,

Pennsylvania. Doe and her partner, Deputy Brian Szumski, traveled to and entered the residence, finding it in disarray with garbage and even the carcass of a dead cat on the floor. Although they did not find the subject of the warrant, they were soon to discover other unwelcome residents.

Upon exiting the residence, Doe noticed that there were a multitude of fleas crawling on her and Szumski. The officers radioed the Department's headquarters regarding the flea encounter and asked for further instructions. After some delay, the Department directed the officers to proceed to a nearby Emergency Management Building ("EMA") and await construction of a temporary decontamination shower. The officers were told to stay inside their police cruiser until Chief Deputy Arthur Bobbouine, a superior officer to both Doe and Szumski, arrived at the EMA.

Approximately twenty minutes later, Bobbouine arrived at the EMA along with Foy, who was also a superior officer to both Doe and Szumski, and Deputies Erin Joyce and Michael Patterson. Foy brought a video camera and immediately began to film Doe and Szumski, who both remained inside their parked vehicle with the windows up. Doe requested to exit the vehicle because of the high temperature and the fleas' continual biting. Bobbouine and Foy ordered Doe and Szumski to remain in the police cruiser to limit the spread of fleas. Foy continued to film the scene, allegedly laughing at Doe and Szumski's plight and taunting them. Doe testified at her deposition that she asked Foy to stop filming on at least four specific occasions during the events in question, but that he continued and told her at least

4

one time to "shut up" because it was for "training purposes."[1] County Defendants, however, assert that Doe never requested that Foy stop filming.

The EMA employees were unable to construct the decontamination shower. Bobbouine therefore instructed Doe and Szumski to drive to Mercy Hospital (the "Hospital"), which was equipped with a decontamination facility.[2] Once at the Hospital, Szumski was taken inside and Doe was told to wait in the police cruiser while Szumski underwent the decontamination process. After approximately forty-five minutes, Foy radioed Doe and directed her to remove her boots and socks, place them in the trunk of the police car, and proceed toward the hospital entrance. As Doe approached, Foy exited the Hospital and walked toward her, filming all the while. Doe testified that she again demanded that Foy stop filming but that Foy refused and reiterated that he was filming

[1] Foy testified that Bobbouine ordered him to create a training video of the "decontamination process." Foy's explanation is, at best, suspect. First, Bobbouine, Foy's superior, testified that he did not know why Foy was filming. Second, Deputy Mandy Leandri testified that, prior to Bobbouine and Foy leaving to meet Doe and Szumski at the EMA, Bobbouine and Foy discussed how they would tell everyone they were making a training video so that no one would question why they were filming. Third, as will be discussed in more detail *infra*, Foy uploaded the video and showed it to other officers as a joke, not in the context of a training video. Finally, no training video was ever produced from the footage Foy shot that day. Thus, a reasonable jury could conclude that Foy's "training video" explanation was a pretext to mask his misconduct.
[2] Mercy Hospital is now Geisinger South Wilkes-Barre.

5

for "training purposes."

Doe entered the Hospital and was met by Joyce, a female deputy, who then led her to a large open showering room (the "Decontamination Area"). Joyce did not follow Doe inside, but stood in the doorway with the door opened slightly so that she could read Doe instructions about the decontamination process and how to apply special chemical shampoo. Doe did not undress until Joyce finished the instructions and closed the door completely (though the door could not be locked because it contained no locking mechanism). Doe then showered without incident.

After Doe completed her shower, she realized that there were no towels in the Decontamination Area. There was, however, a roll of thin paper of the type that typically covers a doctor's examination table. Doe asserts that this paper was semi-transparent or that Doe's wet body caused the paper to become semi-transparent; County Defendants deny both assertions. Through the closed door, Joyce told Doe to wrap the hospital paper around her private areas so that Joyce could enter the room and examine Doe to ensure that no fleas remained. Once Doe had complied, Joyce entered, closed the door behind her and began inspecting Doe for any surviving fleas. At this point, Doe's back was facing the door; most of her back, shoulders and legs were completely exposed, and the thin paper, which could have been semi-transparent, was wrapped around her buttocks and breasts.

While Joyce examined Doe for fleas, Bobbouine and Foy, unbeknownst to the two female deputies, opened the

Decontamination Area's door approximately a foot and observed Doe. Foy began filming again. After viewing Doe for some unknown period of time, Bobbouine said, in reference to a tattoo on Doe's back, "What's that shit all over your back?" Startled, Doe thought this meant that there were fleas on her back, and she instinctively turned her head while trying to brush fleas away. As she did so, she caught Bobbouine and Foy out of the corner of her eye. Doe, without turning around, yelled at Bobbouine and Foy to leave the Decontamination Area. She then heard either Bobbouine or Foy say, "They are tattoos on her back. I wonder what they say?" One of Doe's tattoos contains the initials of the woman with whom Doe was in a relationship. Doe, again without turning around, yelled at the men to leave the Decontamination Area.

The parties dispute how much of Doe's body was exposed to Bobbouine and Foy in the Decontamination Area. County Defendants claim that only Doe's bare back, shoulders, legs and arms were observed and filmed, and that at no time were Doe's breasts or buttocks exposed in the Decontamination Area. Doe alleges that there is evidence demonstrating that her breasts and/or buttocks were exposed. Doe asserts that an unknown individual was captured on video stating that he could see her "boobies" and that somebody should grab something to "cover [Doe] up." Doe testified that the outline of her buttocks was visible through the wet paper, and that Bobbouine allegedly made a statement captured on video that he "could see [Doe's] ass."

Joyce closed the Decontamination Area's door, again

7

shielding Doe from Bobbouine and Foy. Joyce then completed her examination of Doe, who was eventually provided with hospital scrubs and transported to the police station.

Later that day, Foy uploaded the video onto his work computer and called several officers, both male and female, into his office to view the footage. It is not clear what Foy showed those congregated in his office. Female Deputy Mandy Leandri testified that Foy displayed a still image of Szumski's bare buttocks, which prompted Leandri to leave Foy's office in disgust. Foy was unable to recall any details about the viewing held in his office other than that Doe was present. Doe, however, testified that she was not present at the viewing and had gone home after the incident at the Hospital. Foy saved several still images, as well as the video of the day's events (collectively, these are the "Doe Files"), in a public computer folder entitled, "Brian's ass," which Doe testified could have been viewed by anyone who had access to the Luzerne County network.

Sometime in April 2008, Leandri rediscovered the "Brian's ass" folder and came across the Doe Files. Leandri testified that she opened one photo of Doe — a close-up of Doe's back showing her tattoo — which Leandri showed to another female deputy and recalled that the two made fun of Doe for tattooing her girlfriend's initials on to her back. Leandri explained that she was "in shock that [Doe] would get someone's initials tattooed" on her. Leandri did not, however, testify that she was surprised that Doe had a girlfriend, nor is there any evidence in the record that, as a

8

result of the September 27 events, anyone learned for the first time that Doe had a girlfriend.

Leandri notified her superior, Sheriff Michael Savokinas, of the Doe Files, and he oversaw removal of the files. At the time of its removal, the "Brian's ass" folder contained five still photos of Doe and Szumski and an edited video clip from the events at issue.[3] Only two of the photos depicted Doe: one was the close-up of her bare back and the other showed Doe's hips, bare back, and bare shoulders. In both photos, the outline of Doe's buttocks — covered only by thin, wet hospital paper — was visible.

In June of 2008, Doe filed a complaint against the County as a municipal defendant and against defendants Foy and Stankus[4] in their individual capacities, alleging two counts. Count One asserted violations of the Fourth Amendment's right to be free from unreasonable searches and seizures, the Fourteenth Amendment's right to privacy and comparable rights arising under Pennsylvania law. Count Two alleged a failure to train claim against the County under 42 U.S.C. § 1983.

On August 31, 2010, the District Court granted summary judgment in favor of County Defendants, dismissing Doe's case in its entirety. The District Court

---

[3] Doe further testified that Foy stopped recording at certain points, and that therefore the video did not include certain events and conversations that occurred on the day in question.

[4] Stankus was the Sheriff of Luzerne County in September 2007.

stated that, "[a]lthough the supposed training video was likely ill-conceived and definitely poorly executed," the "case does not fall within the zone of privacy protected by the Fourteenth Amendment." The District Court further determined that the alleged search — namely Foy's observation and filming of Doe's partially nude body in the Decontamination Area — fell within the "special needs" exception to the Fourth Amendment. Finally, the District Court rejected the failure to train claim because it found that there was no "ultimate constitutional injury" and so there could not be any claim for failure to train.

Doe appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." We have final-order jurisdiction under 28 U.S.C. § 1291.

We review the District Court's disposition of a summary judgment motion *de novo*, applying the same standard as the District Court. *Pichler v. UNITE*, 542 F.3d 380, 385 (3d Cir. 2008) (citing *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All inferences must be viewed in the light most favorable to the nonmoving

10

party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The nonmoving party cannot establish a genuine dispute as to a material fact by pointing to unsupported allegations in the pleadings.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  To defeat a motion for summary judgment, the nonmoving party must raise more than "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and the court must determine that "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Anderson*, 477 U.S. at 252.  "The court may not, however, weigh the evidence or make credibility determinations" because "these tasks are left for the fact finder."  *Pichler*, 542 F.3d at 386 (citations and quotation marks omitted).

## III. Discussion

### A. Constitutional Right to Privacy under the Fourteenth Amendment

"The United States Constitution does not mention an explicit right to privacy and the United States Supreme Court has never proclaimed that such a generalized right exists." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 178 (3d Cir. 2005). *But see Sterling v. Borough of Minersville*, 232 F.3d 190, 193 (3d Cir. 2000) (stating that the Supreme Court "acknowledged the individual's constitutional right to privacy" in *Griswold v. Connecticut*, 381 U.S. 479 (1965)). The Supreme Court, however, has found certain constitutional "zones of privacy." *C.N.*, 430 F.3d at 178 (citing *Roe v. Wade*, 410 U.S. 113, 152–53 (1973)). From these zones of privacy, we have articulated two types of privacy interests rooted in the Fourteenth Amendment. *Nunez v. Pachman*, 578 F.3d 228, 231 n.7 (3d Cir. 2009); *see also Malleus v. George*, 641 F.3d 560, 564 (3d Cir. 2011); *C.N.*, 430 F.3d at 178. The first privacy interest is the "individual interest in avoiding disclosure of personal matters," and the second is the "interest in independence in making certain kinds of important decisions." *C.N.*, 430 F.3d at 178; *see also Malleus*, 641 F.3d at 564; *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000). The first privacy interest is at issue in this matter.

"'The right not to have intimate facts concerning one's life disclosed without one's consent' is 'a venerable [right] whose constitutional significance we have recognized in the

12

past.'" *C.N.*, 430 F.3d at 179 (quoting *Bartnicki v. Vopper*, 200 F.3d 109, 122 (3d Cir. 1999)). Justice Brandeis, in dissent, famously referred to this as "the right to be let alone." *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).

The touchstone of constitutional privacy protection is whether the information at issue is "within an individual's reasonable expectations of confidentiality." *Malleus*, 641 F.3d at 564; *see also C.N.*, 430 F.3d at 179; *Fraternal Order of Police, Lodge No. 5 v. City of Phila.*, 812 F.2d 105, 112 (3d Cir. 1987) ("*Fraternal Order of Police*"). The more intimate or personal the information, the more reasonable the expectation is that it will remain confidential. *Fraternal Order of Police*, 812 F.2d at 112-13 (citing *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 & n.5 (3d Cir. 1980)); *see also Malleus*, 641 F.3d at 564; *C.N.*, 430 F.3d at 179. Indeed, the "federal constitution . . . protects against public disclosure [of] only highly personal matters representing the most intimate aspects of human affairs," thereby shielding from public scrutiny "only that information which involves deeply rooted notions of fundamental personal interests derived from the Constitution." *Nunez*, 578 F.3d at 232 (emphasis omitted) (citation and quotation marks omitted).

We have found the following types of information to be protected: a private employee's medical information that was sought by the government; medical, financial and behavioral information relevant to a police investigator; a public employee's prescription record; a minor student's

13

pregnancy status; sexual orientation; and an inmate's HIV-positive status. *Malleus*, 641 F.3d at 565 (citing cases and explaining that information encompassed by the constitutional right to privacy may be separated into categories reflecting sexual, medical and some financial information).

Although the issue of whether one may have a constitutionally protected privacy interest in his or her partially clothed body is a matter of first impression in this circuit, other circuits — including the Second, Sixth and Ninth Circuits — have held that such a right exists. *See, e.g.*, *Poe v. Leonard*, 282 F.3d 123, 136-39 (2d Cir. 2002) (finding that plaintiff, a female civilian who was participating in a police training video, alleged sufficient facts to raise a triable issue of whether her constitutional right to privacy was violated where the male police officer surreptitiously filmed her in the dressing room while topless and without a bra); *York v. Story*, 324 F.2d 450, 454-56 (9th Cir. 1963) (finding that the plaintiff properly stated a claim for a violation of her constitutional right to privacy where she alleged that, while reporting a sexual assault, a male police officer deceived her into permitting him to photograph her genitals and exposed breasts under the pretext of an investigation), *cert. denied*, 376 U.S. 939 (1964); *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 497-98 (6th Cir. 2008) (finding a privacy violation where a middle school's surveillance cameras recorded the plaintiff students in their undergarments while in the school

14

locker room).[5]

Privacy claims under the Fourteenth Amendment necessarily require fact-intensive and context-specific analyses, and unfortunately, bright lines generally cannot be drawn. The difficulty in drawing a bright line is evident as we are not aware of any court of appeals that has adopted either a requirement that certain anatomical areas of one's body, such as genitalia, must have been exposed for that person to maintain a privacy claim under the Fourteenth Amendment or a rule that a nonconsensual exposure of certain anatomical areas constitutes a *per se* violation. *See, e.g.*, *Poe*, 282 F.3d at 136-39 (conducting a context-specific analysis); *York*, 324 F.2d at 454-56 (same); *Brannum*, 516 F.3d at 493-500 (same but in the Fourth Amendment context). We likewise refuse to draw bright lines based on anatomical parts or regions. Accordingly, we must analyze the specific circumstances under which the alleged violation occurred.

---

[5] Based on existing precedent in the Sixth Circuit, *Brannum* found that the constitutional right to privacy was protected by the Fourth Amendment's guarantee against unreasonable searches and seizures. 516 F.3d at 494. *Brannum* further recognized that other circuits have found that the "same privacy right is located in the Due Process Clause [of the Fourteenth Amendment]." *Id.* Thus, while the Sixth Circuit may locate the right to privacy in the Fourth Amendment — and we, as well as the Second and Ninth Circuits, locate this right within the Fourteenth Amendment — the contours of the right appear to be the same. *See id.* (referring to "the same privacy right" that other circuits find within the Fourteenth Amendment).

15

We conclude that Doe had a reasonable expectation of privacy while in the Decontamination Area, particularly while in the presence of members of the opposite sex.[6]  The Decontamination Area is a large showering facility, and Doe permitted only Joyce, a female deputy, to enter for the purpose of combing Doe's hair in an effort to remove any remaining fleas.  Upon entering the Decontamination Area, Joyce closed the heavy wooden door to shield Doe's privacy but could not lock it because the door had no locking mechanism.  The record, viewed in the light most favorable to Doe, does not support the assertion that Doe expressly or implicitly consented to Bobbouine and Foy's opening the door or filming the events inside the Decontamination Area.  In fact, Doe testified that she was unaware that Bobbouine and Foy were observing her until Bobbouine spoke, and that she repeatedly asked Bobbouine and Foy to leave the Decontamination Area to no avail.  Joyce then closed the Decontamination Area's door to again shield Doe's privacy.  Doe clearly had a reasonable expectation of privacy while in the Decontamination Area under these circumstances.[7]  Our

---

[6] In addition to the exposure of Doe's body in the Decontamination Area, Doe also asserts that Foy's filming of the tattoo of someone's initials on her back led to the discovery of the private and intimate fact that she is in a lesbianic relationship.  We note that initials of a person generally are not indicative of a person's gender.  Furthermore, such an assertion is belied by the record, which contains no evidence that, as a result of the September 27 events, anyone learned for the first time that Doe had a girlfriend.

[7] *Davis v. Bucher*, 853 F.2d 718 (9th Cir. 1988), a case relied on extensively by County Defendants for the proposition that Doe's

analysis must then turn to whether Doe's exposure meets the lofty constitutional standard of the "most intimate aspects of human affairs" that involve "deeply rooted notions of fundamental personal interests." *Nunez*, 578 F.3d at 232. Because material facts remain in dispute, we are unable to answer that question at this time.

A dispute of material fact exists as to which of Doe's body parts were exposed to members of the opposite sex and/or filmed while she was in the Decontamination Area. County Defendants assert that only Doe's back, shoulders arms and legs were exposed, and that at no time were Doe's breasts or buttocks exposed. Doe has presented evidence, however, that her breasts and/or buttocks may have been exposed. Doe asserts that an unknown individual captured on the videotape allegedly stated that he could see Doe's "boobies" and told others to "cover [Doe] up." Doe also

claims are not of constitutional significance, is inapposite. In *Davis*, one of the plaintiffs was a prisoner who brought photographs of his naked wife into prison. A guard took the photographs and displayed them to two inmates. *Id.* at 719. The Ninth Circuit held that the prisoner's alleged injury was not one of constitutional magnitude because the prisoner "imported the photos into the prison environment, a habitat presenting an inherent risk of disclosure and a cognizable diminution in [the prisoner's] reasonable expectations of privacy." *Id.* at 720. Doe, unlike the prisoner in *Bucher*, had a higher expectation of privacy while she was showering and partially clothed in the Decontamination Area.

17

presented evidence to support her claim that the paper sheet she used to cover her breasts and buttocks was "see-through." This includes: an alleged statement made by Bobbouine and captured on video that he "could see [Doe's] ass"; Doe's testimony that the outline of her buttocks was visible through the wet paper; an alleged statement from an unknown individual captured on video stating that Doe had a "big rip in her ass" (it is unclear from the record whether this comment referred to Doe's body or the paper covering her body); and a statement from an unknown individual that Doe's tan lines were visible. Doe, as the nonmovant, is entitled to have all inferences viewed in the light most favorable to her. *See, e.g.*, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Under the circumstances before us, the issues of whether Doe's breasts or buttocks were exposed would affect the outcome of the suit and thereby are material.

The analysis is not complete, however, because a person's right to avoid disclosure of personal matters is not absolute. *See C.N.*, 430 F.3d at 179; *Fraternal Order of Police*, 812 F.2d at 110. "Disclosure may be required if the government interest in disclosure outweighs the individual's privacy interest." *Fraternal Order of Police*, 812 F.2d at 110 (citing *Trade Waste Mgmt. Ass'n v. Hughey*, 780 F.2d 221, 234 (3d Cir. 1985); *Westinghouse Electric*, 638 F.2d at 577). When making such a determination, we apply a "flexible balancing test" and consider the following factors:

> [1] the type of record requested, [2] the information it does or might contain, [3] the potential for harm in any subsequent

18

nonconsensual disclosure, [4] the injury from disclosure to the relationship in which the record was generated, [5] the adequacy of safeguards to prevent unauthorized disclosure, [6] the degree of need for access, and [7] whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*C.N.*, 430 F.3d at 179-180 (quoting *Westinghouse Electric*, 638 F.2d at 578); *see also Fraternal Order of Police*, 812 F.2d at 110-11.

On the record before us, the aforementioned factors overwhelmingly weigh in Doe's favor. The type of records at issue include photographs of Doe while she is partially dressed and an edited video of Doe that may include images of, among other things, Doe's exposed breasts and/or buttocks. The potential harm of nonconsensual disclosure is exacerbated by the existence of the Internet, where one can upload image and video files and irretrievably share them with the world in a matter of moments. Doe's alleged harm could be aggravated by the context of the disclosure, most notably the facts that the video of the events was shown to others within the workplace and that the alleged violations involved superior officers abusing their authority. The adequacy of safeguards to prevent unauthorized disclosure also favors Doe because there is evidence that Foy saved the Doe Files in a public computer folder, which Doe testified could have been viewed by anyone with access to the Luzerne County network.

19

Finally, although factors 6 and 7 could arguably favor County Defendants based on their alleged need to create a training video of the decontamination process generally, it was not necessary for Bobbouine and Foy to observe or film Doe while she was partially clothed. Hospital scrubs were available but were not provided to Doe until after Bobbouine and Foy's alleged misbehavior in the Decontamination Area.[8]

Accordingly, dismissing Doe's Fourteenth Amendment claim was error at this stage, and we will reverse and remand this matter to the District Court for further proceedings.

## B. SEARCH AND SEIZURE UNDER THE FOURTH AMENDMENT

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The phrase "searches and seizures" connotes that the Fourth Amendment regulates conduct that is "somehow designed to elicit a benefit for the government in an investigatory or, more broadly, an administrative capacity." *United States v. Attson*, 900 F.2d 1427, 1429 (9th Cir. 1990) (holding that a physician employed by the government who drew a blood sample from the defendant for medical, not investigatory, purposes did not conduct a "search" under the Fourth Amendment). Similarly, the Supreme Court has stated that the Fourth Amendment applies

---

[8] County Defendants have not asserted a qualified immunity defense.

to governmental conduct whether "the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards." *New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985) (citations and quotation marks omitted); *see also Camara v. Mun. Court of S.F.*, 387 U.S. 523, 534 (1967) (applying the Fourth Amendment to a governmental inspection program).

In *Poe v. Leonard*, a police officer who invited plaintiff to film a training video for the police academy surreptitiously videotaped plaintiff in a state of partial dress while in her changing room. 282 F.3d 123, 136-37 (2d Cir. 2002). The Second Circuit found that this was not a search under the Fourth Amendment because the officer's surreptitious filming during his assigned duties was for his "personal reasons" and "occurred outside of a criminal investigation or other form of governmental investigation or activity." *See id.*

Here, Doe asserts that County Defendants, in violation of the Fourth Amendment, "unlawfully searched and seized video images" of her in the Decontamination Area. Foy's conduct of recording and disseminating the video and images of Doe was not a search or seizure under the Fourth Amendment. At oral argument, Doe's counsel conceded that Foy filmed Doe for personal interest, and that Foy did not film Doe in furtherance of any governmental investigation. Because Foy acted for personal reasons and outside the scope of a governmental investigation, his actions do not implicate the Fourth Amendment. *Poe*, 282 F.3d at 136-37. Accordingly, we will affirm the District Court's dismissal of

21

Doe's Fourth Amendment claim.[9]

## C. FAILURE TO TRAIN

Under 42 U.S.C. § 1983 ("§ 1983"), a municipality may be liable for the failure to train its employees only where that failure amounts to "deliberate indifference to the [constitutional] rights of persons with whom the police come in contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Woloszyn v. County of Lawrence*, 396 F.3d 314, 324 (3d Cir. 2005). In other words, a municipality can only be liable under § 1983 where the failure to train demonstrates a "deliberate" or "conscious" choice by the municipality. *Woloszyn*, 396 F.3d at 324 (citing *City of Canton*, 489 U.S. at 389). To determine whether a municipality's alleged failure to train its employees amounted to a deliberate or conscious choice, it must be shown that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (citing *Walker v. N.Y.C.*, 974 F.2d 293, 297-98 (2d Cir. 1992)).

"Moreover, for liability to attach in this circumstance

---

[9] Because we hold that there was no search or seizure implicating the Fourth Amendment, there is no need to consider whether the "special needs" exception to the Fourth Amendment, which the District Court relied on, is applicable under these circumstances.

22

the identified deficiency in a city's training program must be closely related to the ultimate injury," *City of Canton*, 489 U.S. at 391, meaning that the plaintiff must "prove that the deficiency in training actually caused [the constitutional violation at issue]." *Id.*; *see also Woloszyn*, 396 F.3d at 325.

Here, the record does not support Doe's claim that the County's alleged failure to train amounted to deliberate indifference towards Doe's constitutional rights. The record does not demonstrate that any of the County's policymakers knew that its employees would likely confront a situation implicating the violation of one's right to privacy when videotaping certain activities. Similarly, the record is devoid of any evidence that there has been a history of County employees mishandling the production of training videos or videotaping in general; indeed, there is no evidence that there has ever been another incident like the one Doe experienced. *See City of Oklahoma v. Tuttle*, 471 U.S. 808, 823–24 (1985) (stating that a "single incident of unconstitutional activity" is generally insufficient to make out a claim unless there is proof that the incident "can be attributed to a municipal policymaker"). Further, it cannot be said that a wrong choice by a County employee while producing a training video or videotaping in general will frequently cause a deprivation of one's constitutional right to privacy. *See* supra Section III.A (stating that the constitutional right to privacy is limited and protects public disclosure of only "highly personal matters representing the most intimate aspects of human affairs") (citing *Nunez*, 578 F.3d at 231-32). Consequently, any alleged failure by the County to train its employees did not amount to deliberate indifference towards Doe's

23

constitutional rights.

In any event, Doe has not produced sufficient evidence demonstrating that a deficiency in the County's training program actually caused the alleged violation of her constitutional privacy right. Accordingly, we will affirm the District Court's dismissal of Doe's failure to train claim against the County.

## IV. CONCLUSION

For the reasons set forth above, we will reverse the District Court's order dismissing Doe's constitutional right to privacy claim under the Fourteenth Amendment and remand the case for further proceedings. We will affirm the District Court's order in all other respects.